UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

      **Plaintiff**

      v.                                                    Civil Action No.  05-1137 (JGP)

**MARY B. LEVIN,**

      **Defendant**

**MEMORANDUM**

The United States filed suit June 8, 2005 to recover tuition paid on behalf of Mary Levin under the National Health Service Corps ("NHSC") Scholarship Program, authorized by 42 U.S.C. § 254o.  The Complaint alleges that Levin breached her scholarship contract. (Compl. ¶ 1.)  The Defendant, Ms. Levin, seeks summary judgment, arguing that the suit was not timely filed under the six-year statute of limitations that she claims is applicable.  The Defendant's Motion for Summary Judgment is hereby denied.

**I. Standard of Review**

The standard of review for a motion of summary judgment is whether a genuine issue exists as to any material fact and whether the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. A fact is not material unless it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 248, 106 S. Ct. 2510 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247, 106 S. Ct. 2510 (emphasis omitted).  There are no

facts in dispute material to the date the government's right of action against Levin accrued. It accrued after June 8, 1999, such that the government's claim was not barred by the statute of limitations and Levin is not entitled to summary judgment.

## II. Background

In 1994, Levin signed an agreement to participate in the NHSC Scholarship Program, which provides scholarship monies to pay for medical school in return for participants' agreement to provide two or more years of service following graduation and certification as a medical professional. Among the conditions of the agreement, participants must "maintain an acceptable level of academic standing." (Ex. B.) *See also* 42 C.F.R. § 62.10(b). Levin struggled academically her first several semesters in medical school due to alleged medical problems. (Mem. P. & A. Supp. Def.'s Mot. Summ. J. 2-3.) In January 1996, Levin's educational institution warned her that any additional failing grades would result in her dismissal from the institution. (Mem. Opp'n to Pl.'s Mot. Summ. J. 3.) She subsequently received failing grades in April and May 1996, and, by a letter dated June 13, 1999 or June 14, 1999,[1] she was dismissed from the medical program for academic reasons. (*See* Mem. P. & A. Supp. Def.'s Mot. Summ. J. 8.) (*But see* Mem. Opp'n Mot. Summ. J. 3.) By a letter dated December 16, 1999, the Department of Health and Human Services ("the agency") informed Levin that she had breached her NHSC agreement as of June 14, 1996 and that she was obligated to repay the government within three

---

[1] Both parties acknowledge that Levin's medical school notified her of her dismissal by letter, but there is a discrepancy as to whether the letter was dated June 13, 1996 or June 14, 1996. Because the outcome of the motion is identical regardless of whether the letter was dated June 13, 1996 or June 14, 1996, this discrepancy is not material. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S. Ct. 2548 (1986).

years of that date, or June 14, 1999.[2] (Decl. Of Christine Herald 3.) Repayment was never made. Both parties agree that during Levin's medical school career, she failed to "maintain an acceptable level of academic standing," thereby breaching the terms of her NHSC scholarship contract. (Ex. B.)

To recover Levin's obligation, the government instituted suit June 8, 2005 to enforce the damages provision of Levin's NHSC agreement. Under 28 U.S.C. § 2415, the default statute of limitations for actions founded upon contract claims, the government has a six-year statutory period to commence litigation. NHSC scholarship agreements are properly considered contracts and were subject to this six-year statutory period prior to 2002. *See United States v. Westerband-Garcia*, 35 F.3d 418, 421 (9th Cir. 1994); *United States v. Avila*, 687 F. Supp. 778, 783 (W.D.N.Y. 1988). In 2002, however, the Health Care Safety Net Amendments of 2002, Pub. L. No. 107-251 (2002), altogether eliminated a statute of limitations for actions enforcing NHSC agreements. The Court need not explore whether or not to apply Pub. L. No. 107-251 retroactively,[3] however, because the government's claim is timely even under the previously applicable six-year statutory period. Thus, the following analysis assumes the applicability of a six-year statute of limitations.

### III. Right of Action Accrues Three Years from Breach of Contract

The government's right of action accrues the date damages to be paid the government are due – not the date of the breach of an NHSC agreement. *See Avila*, 687 F. Supp. at 783. *See also*

---

[2] This "due date" had already passed by the December 16, 1999 letter notifying Levin of the "due date."

[3] This inquiry would take place under *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S. Ct. 1483 (1994).

*United States v. Santos*, 785 F. Supp. 843 (N.D. Cal. 1992) (holding that the statutory period begins to run when the government acquires the right to pursue a claim); *United States v. Richards*, No. 87-1103, 1988 WL 4575, at *1 (4th Cir. Jan. 19, 1988) (per curiam) (holding debt becomes due and statute of limitations begins running three years after date of the breach). Under the terms of the scholarship contract to which Levin agreed, repayment of scholarship funds must be made within three years of the date the participant becomes liable to make the payment. (Ex. B). *See also* 42 C.F.R. § 62.10(b). Thus, the date of a participant's breach is relevant insofar as the government's right of action accrues three years from the date that the substantive term of the NHSC agreement is breached.[4] The government argues that the breach occurred June 14, 1996, when Levin was formally dismissed from school. Levin, however, claims that the breach occurred in either April or May 1996, when she received failing grades in her final classes. (Mem. P. &. A. Supp. Def.'s Mot. Summ. J. ¶¶ 5-6.)

**IV. Language of Regulation Controls**

Levin breached her scholarship contract when she "fail[ed] to maintain an acceptable level of academic standing in the course of study for which the scholarship award [was] provided." (*See* Ex. B.). In constructing when an "acceptable level of academic standing" is no longer being maintained, the authorizing statute and agency regulations pursuant to which the contract terms were drafted are controlling. *Westerband-Garcia*, 35 F.3d at 421. ("[S]tatutory intent rather than common law contract defenses control the interpretation of the terms of the

---

[4] The date of the breach of the NHSC agreement is not necessarily dispositive in determining the date the statute of limitations begins running. *In re Owens*, 82 B.R. 960, 962 n.1 (N.D. Ill. 1988) contemplates that the agency can postpone the "official breach date" when a participant breaches an NHSC agreement to allow a debtor more time to repay her loans. In the government's suit against Levin, however, the agency did not postpone the "official breach date," and both parties presuppose that the right of action accrued three years from the date of the actual breach of the NHSC agreement.

NHSC scholarship agreement.") Under the authorizing statute, the agreement is breached when a participant, "fails to maintain an acceptable level of academic standing in the educational institution in which he is enrolled (such level determined by the educational institution under regulations of the Secretary)." 42 U.S.C. § 254o(a)(1)(a). Because agency involvement is expressly invited by statute, the subsequent regulation, 42 C.F.R. § 62.10(b), governs with respect to how educational institutions are supposed to determine that an acceptable level of academic standing has been transgressed by participating students. *Chevron, U.S.A. v. Natural Resources Defense Council,* 468 U.S. 1227, 105 S. Ct. 28 (1984). Thus, the following agency regulation is incorporated into Levin's NHSC agreement:

> "When a participant fails to maintain an acceptable level of academic standing, is dismissed from the school for disciplinary reasons, or voluntarily terminates the course of study or program for which the scholarship was awarded before completing the course of study or program, the participant must, instead of performing any service obligation, pay to the United States an amount equal to all scholarship funds awarded.

42 C.F.R. § 62.10(b).[5]

In ascertaining the date Levin "fail[ed] to maintain an acceptable level of academic standing," the language of the regulation itself, rather than any subsequent agency interpretation, governs if the language of the regulation is clear and unambiguous. *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S. Ct. 1655, 1663 (2000) ("To defer to the agency's position [when constructing an unambiguous regulation] would be to permit the agency, under the guise

---

[5] The agency promulgated 42 C.F.R. § 62.10(b) pursuant to 42 U.S.C. § 254o(a)(1)(a), which dictates that a participant, "fails to maintain an acceptable level of academic standing in the educational institution in which he is enrolled (such level determined by the educational institution under regulations of the Secretary)."

of interpreting a regulation, to create *de facto* a new regulation."). While the government has introduced evidence of a "long-standing agency interpretation" under which Levin breached her agreement when she was dismissed from school, this interpretation is not entitled to any deference unless the language of the regulation is ambiguous. *See Christensen,* 529 U.S. at 586, 120 S. Ct. at 1662. The inquiry into whether a regulation is ambiguous depends on whether "the issue [at hand] is settled by the plain language of the regulation." *United States. v. Deaton*, 332 F.3d 698, 710 (4th Cir. 2003). The regulation is ambiguous if it can reasonably be interpreted multiple ways giving rise to multiple conclusions. *See Drummond Coal Co. v. Hodel*, 610 F. Supp. 1489, 1498 (1985). *See e.g., Auer v. Robbins,* 519 U.S. 452, 455-58, 117 S. Ct. 905, 908-10 (1997). Thus, the first question is whether the plain language of the regulation governing Levin's NHSC agreement settles the issue of when she breached her scholarship contract or if there are multiple reasonable interpretations giving rise to multiple conclusions about when the breach occurred.

      In interpreting the plain language of the regulation, the Court may presume that the agency drafted the regulations with the intention of making the regulations administrable. *See Drummond*, 610 F. Supp. at 1501 (holding that the Secretary may assume the importance of creating an administratively enforceable regulation). *Cf. Bailey v. United States*, 52 Fed. Cl. 105, 112 (2002) ("A strong preference has been articulated for courts to interpret statutory language so as to preserve, rather than destroy, the statutory scheme."). Absent a regulatory scheme using dismissal as the indicia of unacceptable academic performance, the alternative, individualized, subjective inquiries, would overwhelm the program. More than 27,000 health care professionals have participated in the NHSC program since its inception. Department of Health and Human

Services, http://nhsc.bhpr.hrsa.gov/about/ (last visited Jul. 27, 2007).  It is not feasible for the agency to administer a program that requires monitoring the grades of individual students and the grading patterns of individual institutions to harmonize assessments of academic performance. The NHSC program necessitates an essentially bright line test, such as that most readily afforded by using dismissal from school as the measure of academic failure.

> The Defendant argues that it is significant that both the statute and the regulation use the term, "dismissal," to identify when a breach is triggered by conduct warranting disciplinary action but do not use that term to explain when academic unacceptability triggers breach of the agreement.  *See*  42 U.S.C. § 254o(a)(1)(A)-(B); 42 C.F.R. § 62.10.  "The only inference that can be drawn is that Congress did not intend the exact date of dismissal for academic reasons to be the triggering event – it intended that some earlier date be the triggering date." (*See* Def.'s Reply Pl.'s Opp'n Mot. Summ. J. 5.) It is true that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *National Wildlife Federation v. Hodel*, 839 F.2d 694, 760 n.105, 268 U.S. App. D.C. 15, 81 n.105 (D.C. Cir. 1988) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983). The Defendant's inference is not the only inference, much less the most likely inference, however. Semantically, Congress may not have conceived that the process by which a student was asked to depart school for poor academic performance constituted a "dismissal."  Instead, it is plausible to infer that the statute and subsequent regulation contemplated that when a student failed out of school or "fail[ed] to maintain an acceptable level of academic standing, she became liable for tuition paid on her behalf.  Under this interpretation, departure from school, whether it be for

academic reasons, disciplinary reasons, or reasons that induce voluntary departure, necessarily trigger a breach of the NHSC agreement.  Statutory language indicating that both dismissal for disciplinary reasons and voluntary termination of school also result in breach of the agreement suggest that Congress contemplated that departure from school for any reason ought to result in liability.  42 U.S.C. § 254o(a)(1)(B)-(C).

Additionally, it is also possible to infer that Congress deliberately omitted the term, "dismissal" to afford the agency discretion over how to measure unacceptable academic performance, whether it be dismissal or some other indicia of academic failure.  *National Wildlife Federation*, 839 F.2d at 760, 268 U.S. App. D.C. at 81 (holding omission is not significant when it is the "type of judgment we would expect Congress to leave to the agency given the task of implementing and enforcing" the regulatory scheme). This inference is supported by the text of the statute itself, which expressly contemplates the Secretary's involvement in assessing how educational institutions are to determine when a participant "fails to maintain an acceptable level of academic standing." 42 U.S.C. § 254o(a)(1)(A).  In drafting the subsequent regulation, the agency retained the language that omitted the term "dismissal" from characterizing when an acceptable level of academic standing is no longer met.  For the administrability concerns outlined above, however, it is not reasonable to interpret the regulation as dictating that participants become liable at some arbitrary level of academic standing independent of dismissal.  Instead, the Secretary may have continued to omit the term "dismissal" from the regulation in order to retain this discretion in administering the program.

Among the three potential inferences derived from the regulation's language choice outlined above, those inconsistent with a functioning scholarship program should be disregarded

in favor of those consistent with an administratively functioning scholarship program. *See Drummond*, 610 F. Supp. at 1501. Thus, the idea that Congress did not intend the date of dismissal to be the date of a breach should disregarded in favor of the other inferences, including the plausibility of a bright line rule that dismissal for any reason ought to result in that person's breach. Under this interpretation of the regulation, a participant's failure to maintain an acceptable level of academic standing takes place when he or she is dismissed from school. Applied to Levin's breach, Levin breached her contract when she was dismissed from school.

Even in light of administrability concerns, it is also "reasonable" to interpret the regulation as contemplating that the agency has the authority and discretion to adjudge when academic performance is unacceptable. In practice, this interpretation would yield a general rule that dismissal is the indicia of academic unacceptability. The agency would merely possess the authority to exercise discretion – discretion that could only be exercised in extreme, rare circumstances for the program to function. Administrability necessitates a default rule that dismissal be used as the indicia of when a breach occurs, even if the government could potentially take action in extreme circumstances. Arguably supporting this interpretation, *In re Owens*, 82 B.R. 960, 962 (N.D. Ill. 1988) acknowledges that the agency has discretion over when to consider the NHSC agreement breached. *Id*. at 962 n.1 ("The Debtor actually breached the scholarship agreement on December 3, 1981, the date she left school. However, due to an administrative delay, the Debtor was given an official breach date of May 3, 1982 by HHS."). Moreover, this explanation is consistent with the parallel construction of the language. Omitting the term, "dismissal" from the clause has utility if it is possible that academic performance that does not result in a student's dismissal could still result in a breach. Because the authority to

9

exercise discretion does not require that authority to be exercised or suggest when it will be exercised, Levin breached her agreement upon being dismissed from school absent any indications otherwise.

Despite two plausible readings, both interpretations give rise to the same conclusion about when Levin's breached occurred: under either interpretation, Levin breached her agreement June 13, 1996 or June 14, 1996, when she was dismissed from school. Because these interpretations give rise to the same conclusion about when Levin breached her agreement, the regulation is not ambiguous with respect to when NHSC agreements are breached for academic unacceptability. *See Drummond Coal Co.,* 610 F. Supp. at 1498; *Deaton*, 332 F.3d at 710. Where the language of the regulation is not ambiguous, the regulation itself applies. And, applying either reasonable interpretation of 42 C.F.R. § 62.10, Levin breached her agreement when she was dismissed from school.

### V. Agency Interpretation Entitled to Deference in the Alternative

Assuming, *arguendo*, that one could *reasonably interpret* the regulation as suggesting that Levin necessarily breached her scholarship contract before she was formally dismissed from school, the Court would reach the same conclusion: Levin breached her agreement when she was dismissed from school. Assuming the existence of a reasonable interpretation resulting in a different conclusion, the regulation would be considered ambiguous. *Deaton*, 332 F.3d at 710. If a regulation is ambiguous, subsequent agency interpretations of the regulation are entitled to some deference. *Auer,* 519 U.S. at 461, 117 S. Ct. at 911. Once a determination has been made that a regulation is not clear and unambiguous on an issue, "[a] Secretary's . . . interpretation of [his own regulations] is . . . controlling unless 'plainly erroneous or inconsistent with the regulation,'"

*Auer,* 519 U.S. at 461, 117 S. Ct. at 911. *See also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 2386-87 (1994) ("An agency's interpretation of its own regulations . . . must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'") (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217 (1945)). *See also Drummond*, 610 F. Supp. at 1496. ("To sustain the agency's interpretation, the Court 'need not find that [the agency's] construction is the only reasonable one, or even that it is the result [that] would have [been] reached had the question arisen in the first instance in judicial proceedings.'") (quoting *Udall v. Tallman*, 380 U.S. 1, 16, 85 S. Ct. 792, 801 (1965)). In the instant case, the government filed the Declaration of Christine D. Herald to establish that dismissal from school constitutes a breach under the agency's interpretation of its regulation. According to the Declaration, "[t]here is a longstanding agency interpretation that 'fail[ure] to maintain an acceptable level of academic standing' includes those NHSC Scholarship Program participants who are dismissed from medical school for poor academic performance." (Decl. 2.) As the agency's interpretation of the regulation, the Declaration is entitled to controlling weight unless it is plainly erroneous or inconsistent with the earlier regulation. *Auer,* 519 U.S. at 461, 117 S. Ct. at 911.

   The Declaration is consistent with both the agency regulation and the authorizing statute. An interpretation of a regulation is inconsistent with the regulation itself if the regulation has a "plain and sensible meaning" and the agency interpretation is clearly contrary to that meaning. *Hart v. McLucas*, 535 F.2d 516, 520 (9th Cir. 1976). Arguably, the ambiguity presupposed to embark on the inquiry of whether to even consider an agency interpretation in the instant case suggests that there is no "plain and sensible meaning" to which the Declaration could be contrary.

Additionally, the language of the agency's interpretation is consistent with the regulation and the authorizing statute. The authorizing statute expressly contemplates that individual educational institutions, rather than the agency, will assess academic performance. 42 U.S.C. § 254o(a)(1)(A) (holding the "acceptable level of academic standing" is to be "determined by the educational institution under regulations of the Secretary"). Using dismissal as the indicia of unacceptable academic performance is consistent with a statutory scheme under which the educational institutions themselves determine whether academic standing is acceptable. As such, the agency's interpretation is clearly not *inconsistent* with the authorizing statute, but it is also *consistent* with that legislative language.

Similarly, the agency's interpretation (as evidenced by the Declaration) is consistent with the language of the regulation. The Declaration is not clear as to whether, under the agency's interpretation, dismissal is the exclusive means by which the agency recognizes that a participant has failed to maintain an acceptable level of academic standing. Regardless, the agency's interpretation is consistent. If dismissal is the exclusive indicia of when NHSC agreements are breached for academic unacceptability, the agency's interpretation is consistent with a bright line rule of dismissal as the indicia of breach. This bright line rule could either be understood as dictated by regulation or understood as administered at the discretion of the agency. If dismissal is not the exclusive indicia of breach, the agency's interpretation is consistent with interpreting the regulation to afford the agency the discretion to allege when a breach has occurred. Either agency interpretation would be consistent with the language of the regulation and authorizing statute, and thus the Declaration is consistent with the regulation and authorizing statute.

Further, the agency's interpretation is not "plainly erroneous." Administrabilty

necessitates that the NHSC program use objective, easy-to-measure indicia of academic acceptability given the large number of participants and the variance among educational institutions. Moreover, using dismissal as the indicia of academic failure defers to the minimum academic level at which an educational institution is still willing to certify a student, thereby affording educational institutions discretion expressly contemplated by the authorizing statute, 42 U.S.C. § 254o(a)(1)(A). Levin's own experience in medical school evidences the importance of affording discretion to the educational institution. She had medical problems that her school apparently viewed as mitigating her academic performance several semesters. Were some arbitrary academic measurement, like grade point average, the index of when a breach occurs, the test would be over-inclusive when medical problems with no bearing on a student's professional potential manifested themselves as academic problems. Moreover, dismissal is a sensible indicia of when a breach has occurred since NHSC participants formally dismissed are no longer capable of fulfilling the service obligations incurred in the NHSC agreement.

      The Defendant herself seems to contemplate that dismissal or notice of dismissal is what triggered her failure to "maintain an acceptable level of academic standing." Levin argues that the NHSC agreement was breached in April or May 1996, when she received her final failing grades. Yet, she had failed numerous other courses, including all of her first semester courses and several of the first year courses she repeated during her second year. Arguably, her final failing grades are distinguishable in that Levin had been informed that she would be dismissed if she failed any additional courses, but holding this distinguishing factor to be relevant acknowledges that *dismissal*, or at least notice of it, triggers the breach. This acknowledgment undermines any effort to point to the parallel construction of the applicable regulation as dictating that a failure to

"maintain an acceptable level of academic standing" must mean something other than "dismissal." Moreover, formal dismissal is a far more compelling trigger than constructive notice of dismissal. The numerous "second chances" Levin received throughout her medical school career suggest that failing grades do not necessarily result in dismissal and threats of dismissal may not be enforced. (*See* Mem. P. & A. Supp. Def.'s Mot. Summ. J. 2) ("Ms. Levin was advised that any grade below passing level from August 1995 forward . . . put her at risk for dismissal . . . [S]he received a non-passing grade . . . in January 1996 . . . The [Educational Evaluation Committee] recommended that she be allowed to remain in the M.D. program."). Moreover, it would be extremely difficult for the agency to keep track of "threats" of dismissal. Administratively and practically, formal dismissal is a more appropriate indicia of a breach.  Thus, the agency's interpretation of its own regulation, using dismissal as at least one of the indicia of when a breach has occurred, is not "plainly erroneous."  Coupled with the fact that this interpretation is also consistent with the language of the regulation, it is entitled to deference by the Court.  Deferring to the agency interpretation, Levin breached her NHSC agreement when she was dismissed from school.

Notably, an interpretation may be "unworthy of deference" if it is "a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack. *Auer*, 519 U.S. at 462, 117 S. Ct. at 912 (citation omitted).  Applying this standard, *Auer* held that an agency interpretation in the form of a legal brief was still "worthy" of deference despite the existence of litigation interests on the part of the agency. *Id.* at 462, 117 S. Ct. at 912 ("There is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question."). Under this case law, the Declaration should be entitled to deference despite the government's litigation interests in the present case. Moreover,

the implausibility of administering the system under any test other than that offered by the Declaration as the agency's interpretation supports the credibility of the Declaration as a fair and considered judgment on the matter in question. Thus, while it is possible that some agency interpretations are not worthy of deference, the Declaration in the instant case is worthy of deference. As such, the agency's interpretation controls and Levin should be deemed to have breached her agreement when she was dismissed from school.

**VI. Conclusion**

If all reasonable interpretations of the language yield the same conclusion, regulatory language deeming that an NHSC participant breaches her agreement if she "fails to maintain an acceptable level of academic standing" controls as to when Levin breached her NHSC agreement. *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S. Ct. 1655, 1664 (2000). Because administrability concerns dictate that dismissal must be at least one of the indicia of when a breach occurs, Levin breached her NHSC agreement when she was dismissed from school (either July 13, 1996 or July 14, 1996), the government's right of action accrued July 13, 1999 or July 14, 1999, and the government's claim was not yet barred as of June 8, 2005. Even assuming that the regulation is ambiguous as to the date of a breach, however, the agency interpretation of its regulation yields the same result. The agency's interpretation, which uses dismissal as at least one of the triggers of a breach of the NHSC agreement, is neither plainly erroneous nor inconsistent with the regulation and thus is entitled to deference under the case law. *Auer,* 519 U.S. at 461, 117 S. Ct. at 911. Affording the agency interpretation controlling weight, Levin breached her agreement when she was dismissed from school July 13, 1996 or July 14, 1996. Thus, under this analysis, the government's right of action against Levin accrued July 13, 1999 or July 14, 1999

and the statute of limitations had not yet run June 8, 2005 when the government filed suit. As such, the government's claim was timely filed and Levin's motion for summary judgment is hereby denied. An appropriate order has been filed.


**DATE: July 27, 2007**

                                                        **JOHN GARRETT PENN**
                                                        **United States District Judge**